PHILLIP A. TALBERT
Acting United States Attorney
KEVIN C. KHASIGIAN
Assistant U. S. Attorney
501 I Street, Suite 10-100
Sacramento, CA 95814
Telephone: (916) 554-2700

Attorneys for the United States

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>           Plaintiff,<br><br>    v.<br><br>APPROXIMATELY $99,900.00 IN U.S. CURRENCY,<br><br>APPROXIMATELY $37,965.00 IN U.S. CURRENCY, AND<br><br>APPROXIMATELY $45,005.00 IN U.S. CURRENCY,<br><br>           Defendants. | 2:20-MC-00229-KJM-EFB<br><br>CONSENT JUDGMENT OF FORFEITURE |

Pursuant to the Stipulation for Consent Judgment of Forfeiture, the Court finds:

1.    On March 23, 2020, agents with the Drug Enforcement Administration ("DEA") contacted Nicholas Keenoy ("Keenoy" or "claimant"), Corey McCloud ("McCloud" or "claimant"), and Corey Lettieri ("Lettieri" or "claimant") at the Sacramento International Airport in Sacramento, California. Approximately $99,900.00 in U.S. Currency was seized from Keenoy, Approximately $37,965.00 in U.S. Currency was seized from McCloud, and Approximately $45,005.00 in U.S. Currency was seized from Lettieri during this encounter (hereafter collectively "defendant currency").

2.    The DEA commenced administrative forfeiture proceedings, sending direct written notice to all known potential claimants and publishing notice to all others. On or about June 8, 2020, the DEA

1

received claims from Keenoy, McCloud, and Lettieri asserting ownership interests in the defendant currency seized from each of them.

3. Claimants do not contest the United States' representation that it could show at a forfeiture trial that on March 23, 2020, Keenoy, McCloud, and Lettieri traveled on Delta Airlines flight 2462 from Detroit, Michigan to Sacramento, California with their origin of travel being Philadelphia, Pennsylvania. Agents with the DEA received information regarding their travel, which revealed they were flying to California from Philadelphia to purchase approximately 200 pounds of marijuana from a source of supply in Grass Valley, California.

4. Claimants do not dispute the United States' representation that it could show at a forfeiture trial that law enforcement positioned themselves in Terminal "A" associated with Keenoy, Lettieri, and McCloud's incoming flight. Shortly thereafter, law enforcement observed Keenoy, Lettieri, and McCloud exit the terminal and proceed to board the bus going to the rental car terminal. Law enforcement then traveled to the rental car terminal where they observed the claimants sitting together.

5. Claimants do not dispute the United States' representation that a DEA agent approached claimants and informed them that law enforcement was speaking with random individuals at the airport terminals to ensure that everyone was traveling safely amidst the Coronavirus outbreak. The agent asked Keenoy if he, Lettieri, and McCloud were traveling together and Keenoy confirmed they were traveling together. The agent then told Keenoy he noticed that Keenoy had two carry-on bags in his possession and asked for permission to search the bags. Keenoy asked if he had an obligation to allow the agent to search his bags and the agent responded that he had no obligation to let the agent search his bags, but asked for his cooperation in the matter. The agent asked Keenoy how much cash he was traveling with and Keenoy stated that it wasn't much, maybe $25,000. The agent asked Keenoy if he could look at the cash and Keenoy said he did not want the agent searching his bags, but he would open the bags and show the agent the cash. Keenoy then opened his roll-away suitcase and pulled out a rubber band bound stack of $100 bills and showed it to the agent. The agent informed Keenoy that he was not in any trouble, under arrest or being detained, however his bags were going to be detained for further investigation. Keenoy asked if he had to legally leave his bags with the agent and the agent explained to him that the bags were going to be legally detained while the application for a search

warrant was drafted, since Keenoy did not want to allow the agent to search his bags. Keenoy consented to a search of his bags.

6. Claimants do not dispute the United States' representation that the agent then asked Keenoy what the name of his friend was who was standing at the rental car counter. Keenoy stated that his name was "Corey" (Lettieri). The agent then called Lettieri over by name and stated that Keenoy had just shown the agent a large amount of cash within his bags and subsequently asked Lettieri how much cash he was traveling with. Lettieri became immediately disgruntled asking the agent why they were bothering him. The agent informed Lettieri that agents were speaking to several random people at the airport to ensure everyone was traveling safely. The agent then asked Lettieri if he could perform a search of his roll-away suitcase and Lettieri denied consent to search the suitcase. The agent then informed Lettieri that he was not in any trouble, under arrest or being detained, but that his suitcase was going to be detained for further investigation while the application for a search warrant was drafted. After about 20 minutes, Keenoy and Lettieri both consented to a search of their bags and agreed to accompany law enforcement to a separate room at the airport.

7. Claimants do not dispute the United States' representation that at the same time the agent was speaking with Keenoy and Lettieri, a Task Force Officer ("TFO") approached McCloud, who was sitting inside the rental car lobby. The TFO identified himself as law enforcement and asked if he could speak to him and McCloud said yes. The TFO asked McCloud if he had anything illegal inside his luggage and McCloud said no. The TFO asked if he could search his luggage and McCloud answered yes and handed his luggage over to the TFO. The TFO found several bank type zippered bags inside of the backpack and inside were bundles of cash bound with rubber bands. The TFO asked McCloud how much cash he was traveling with and if it was his. McCloud said yes it was his and there was about $17,000.00. The TFO asked McCloud how Philadelphia was affected by all of the COVID-19 regulations and he said all of the stores and businesses were shut down. When asked why he had all the money with him, McCloud said he liked to shop and buy things. The TFO told McCloud that all businesses except grocery stores were closed in California. The TFO explained to McCloud that he was not under arrest and was free to leave at any time, but he wanted to examine the money closer and asked McCloud if he would go to a separate room at the airport where they could talk further and the

3

1  TFO could examine the money. McCloud agreed to go to the separate room with the TFO and other agents.

8. Claimants do not dispute the United States' representation that once in the separate room with Keenoy, Lettieri, and McCloud, law enforcement again informed all three individuals that no one was in any trouble, under arrest, or being detained, but the currency located in their bags was under temporary investigation. All three again acknowledged they understood. Law enforcement spoke to them and they all stated that they lived in Philadelphia and all worked for the "Union" doing similar construction type jobs. They all stated they made approximately $100,000.00 a year. McCloud said he was only staying one night, but Keenoy and Lettieri said they would be staying for a while and would be staying with Keenoy's family in Auburn, California. All three of them said they had brought the cash to California with them because they did not trust banks during this COVID-19 virus shut down time and they wanted to have money to spend while they were out in California visiting. Law enforcement informed them that based on the dollar amounts they claimed to have, they had about one third of their gross yearly salary with them. Additionally, law enforcement told them it was a large amount of cash to bring with them since no stores or casinos were open. They were asked if they withdrew the cash from the bank before they had left Philadelphia and they said they had. Law enforcement pointed out that most banks were not allowing large withdrawals of cash because of the shut down and were limiting withdrawals to several thousand dollars a day. The claimants then said that some of the money had been saved and hidden at home, and some had been withdrawn from the bank.

9. Claimants do not dispute the United States' representation that a drug detection dog alerted to the odor of narcotics on all three sums of currency. Law enforcement then informed Keenoy, Lettieri, and McCloud that their currency was being seized as suspected narcotics proceeds.

10. Claimants do not dispute the United States' representation that a later bank count of the cash seized from Keenoy's carry-on bags totaled $99,900.00 – the defendant currency. The defendant currency seized from Keenoy was broken down in the following denominations: 949 $100 bills and 100 $50 bills.

11. Claimants do not dispute the United States' representation that a later bank count of the

4

cash seized from Lettieri's roll-away suitcase totaled $45,005.00 – the defendant currency. The defendant currency seized from Lettieri was broken down in the following denominations: 112 $100 bills, 372 $50 bills, 760 $20 bills, and 5 $1.00 bills.

12. Claimants do not dispute the United States' representation that a later bank count of the cash seized from McCloud's backpack totaled $37,965.00 – the defendant currency. The defendant currency seized from McCloud was broken down in the following denominations: 75 $100 bills, 86 $50 bills, 1,278 $20 bills, 54 $10 bills and 13 $5.00 bills.

13. Claimants do not contest the United States' representation that it could further show at a forfeiture trial that the defendant currency is forfeitable to the United States pursuant to 21 U.S.C. § 881(a)(6).

14. Without admitting the truth of the factual assertions contained above, claimants specifically denying the same, and for the purpose of reaching an amicable resolution and compromise of this matter, claimants agree that an adequate factual basis exists to support forfeiture of the defendant currency. Keenoy, Lettieri, and McCloud acknowledged that they are the sole owners of the defendant currency, and that no other person or entity has any legitimate claim of interest therein. Should any person or entity institute any kind of claim or action against the government with regard to its forfeiture of the defendant currency, claimants shall hold harmless and indemnify the United States, as set forth below.

15. This Court has jurisdiction in this matter pursuant to 28 U.S.C. §§ 1345 and 1355, as this is the judicial district in which acts or omissions giving rise to the forfeiture occurred.

16. This Court has venue pursuant to 28 U.S.C. § 1395, as this is the judicial district in which the defendant currency was seized.

17. The parties herein desire to settle this matter pursuant to the terms of a duly executed Stipulation for Consent Judgment of Forfeiture.

Based upon the above findings, and the files and records of the Court, it is hereby ORDERED AND ADJUDGED:

1. The Court adopts the Stipulation for Consent Judgment of Forfeiture entered into by and between the parties.

2.  Upon entry of this Consent Judgment of Forfeiture, Approximately $99,900.00 in U.S. Currency and $40,100.00 of the Approximately $45,005.00 in U.S. Currency, together with any interest that may have accrued on the total amounts seized, shall be forfeited to the United States pursuant to 21 U.S.C. § 881(a)(6), to be disposed of according to law.

3.  Upon entry of this Consent Judgment of Forfeiture, but no later than 60 days thereafter, $4,905.00 of the Approximately $45,005.00 in U.S. Currency and the Approximately $37,965.00 in U.S. Currency shall be returned to claimants Nicholas Keenoy, Corey McCloud, and Corey Lettieri through their attorney Jacek W. Lentz.

4.  The United States of America and its servants, agents, and employees and all other public entities, their servants, agents and employees, are released from any and all liability arising out of or in any way connected with the seizure or forfeiture of the defendant currency. This is a full and final release applying to all unknown and unanticipated injuries, and/or damages arising out of said seizure or forfeiture, as well as to those now known or disclosed. Claimants waived the provisions of California Civil Code § 1542.

5.  No portion of the stipulated settlement, including statements or admissions made therein, shall be admissible in any criminal action pursuant to Rules 408 and 410(a)(4) of the Federal Rules of Evidence.

6.  All parties will bear their own costs and attorney's fees.

7.  Pursuant to the Stipulation for Consent Judgment of Forfeiture filed herein, the Court enters a Certificate of Reasonable Cause pursuant to 28 U.S.C. § 2465, that there was reasonable cause for the seizure of the above-described defendant currency.

IT IS SO ORDERED

DATED: May 12, 2021.

_____
CHIEF UNITED STATES DISTRICT JUDGE